Lennie J. DILLON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013–SC–000696–MR

Supreme Court of Kentucky.

RENDERED: OCTOBER 29, 2015

COUNSEL FOR APPELLANT: Mollie Mattingly, Assistant Public Advocate, Department of Public Advocacy, 200 Fair Oaks Lane, Suite 500, Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE: Jack Conway, Attorney General, Jeanne Deborah Anderson, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, 1024 Capital Center Drive, Frankfort, Kentucky 40601–8204

## OPINION OF THE COURT BY JUSTICE NOBLE

The Appellant, Lennie J. Dillon, was convicted of murder for shooting and killing his girlfriend, Amy Dennison, and was sentenced to forty years' imprisonment. On appeal he alleges numerous errors, including that police illegally obtained incriminating statements from him and that the prosecutor improperly discussed his own interactions with a witness to a supposed jailhouse confession by Dillon in an attempt to impeach that witness. Finding no reversible error, this Court affirms Dillon's conviction.

## I. Background

Dennison was last seen before the shooting by an attendant at a local full-service gas station around 1:00 p.m. on the day of the killing, February 29, 2012. Dennison and Dillon were in Dennison's van. Dennison, who was driving, asked the attendant for a pack of cigarettes and the remainder of $30 in gas. Neither Dennison nor Dillon exited the van, and neither was talking to the other, which the attendant noted was unusual. The attendant did not see a gun or any indication that Dennison was being held against her will or otherwise needed help.

What happened next is the subject of dispute.

Dillon told a story of an accidental or self-defense shooting. He claimed that Dennison drove them to the Cedar Grove Cemetery, a place of significance because they used to meet there, and pulled a .38–caliber pistol on him. He believed Dennison was going to shoot him, and they struggled over the gun. Dillon claimed only to have been trying to get the gun away from Dennison, but the gun went off, shooting Dennison in the abdomen above her right hip. Dillon claimed that she nevertheless continued trying to point the gun at him. As the struggle continued, Dennison was shot again, this time in the right side of her head, and she stopped moving. Dillon claimed that he took her out of the front seat and put her on the floor in the back where he tried to stop her head from bleeding, checked for a pulse, and feeling no pulse, tried to start CPR.

According to Dillon, he then got into the driver's seat, intending to drive to a "special place" where he and his brothers had played as children and where his dogs were buried. He claimed that he intended to kill himself there. The van, however, got stuck in the mud before he could get to his destination. He claimed that he got out of the van and walked into the woods, crying and upset. He sat down and smoked two cigarettes. He then pulled out the gun, put the barrel in his mouth, and pulled the trigger. He claimed that the next thing he remembered was waking up in the hospital a month later.

The Commonwealth offered a very different account of what happened, albeit through circumstantial proof. The Commonwealth's theory of the case was that Dillon had brought the gun and had intentionally killed Dennison. That theory was supported by, among other things, the fact that Dennison was eventually found lying

face down in the back of the van; blood-spatter evidence in the back of the van and under the chairs indicating that the head shot happened there; and the fact that there was only blood transfer in the driver's seat with no blood spatter on the driver-side door or window. From this, the Commonwealth argued that only two conclusions could be reached: either Dillon placed Dennison face down in the back of the van and shot her, or he followed her to the back of the van, where she then fell down and he shot her.

Police were alerted to the incident around 2:00 p.m. that day.[1] Several Kentucky State Police and local sheriffs units went to the scene where they found Dennison's van. One of the state troopers, Craig Engler, saw a woman lying on the floor in the van with her head toward the back and feet toward the front. The van doors were locked, and Trooper Engler broke the driver's seat window to gain access to the van. Once the doors were open, the officers found that the woman was dead. She had two gunshot wounds, but no gun was found in the van. The officers had been told that the woman had been with another person earlier in the day, and they suspected he might still be nearby.

They called for a K–9 unit to help search. Once the dog arrived, they tracked about a mile into the woods, where they found Dillon. They had been on the scene at least 30 to 40 minutes and possibly as long as an hour before finding him. Dillon was lying on the ground with the .38–caliber pistol near his hand, which was opening and closing repeatedly, possibly reflexively. The officers ordered him to

move his hand away from the gun, but he did not respond in any way. One of the officers moved behind Dillon and announced that he appeared to have a gunshot wound in the top of his head. The officers then approached Dillon, with one securing the gun, and another handcuffing Dillon with his hands in front of him.

The officer who handcuffed Dillon, Kentucky State Trooper Brandon McPherson, then searched Dillon's body and pockets for weapons, finding only a wallet, a prescription bottle of hydrocodone with Dennison's name on it, a pocket knife, and other personal items. He observed what appeared to be a gunshot entry wound to the roof of Dillon's mouth and an exit wound out the top of his head. Trooper McPherson also sat Dillon up because the man appeared to be choking or gurgling on the blood from the wound in his mouth. Because of the nature of Dillon's wound, McPherson called for both emergency medical services and Life Flight, a helicopter ambulance. The trooper asked the man his name, and he mumbled, "Lennie Dillon." Dillon could not open his eyes because of substantial swelling.

Some time later, while waiting for emergency medical services to respond, the trooper gave Dillon his *Miranda* warnings and asked whether he understood them. Dillon did not speak at that point or at any other point afterward while he was being questioned, but he did nod yes. Since Dillon had the gunshot wound in the roof of his mouth, which was full of blood and tissue, the trooper asked him a series of yes/no questions as follows:

Q: Did you shoot your girlfriend?

A: [nod yes]

---

1. The testimony at trial did not clearly establish how police learned of the incident. At the suppression hearing, however, an officer testified that police had received a 911 call from Dillon's wife, who reported receiving a

call from Dillon saying that he had shot his girlfriend on Kentucky Highway 175 North in a white van and that he was going to shoot himself. Though Dillon was still married, he had been living with Dennison.

Q: Did you shoot yourself?

A: [nod yes]

Q: Are you wanting to die?

A: [nod yes]

Q: Is your girlfriend Amy Dennison?

A: [nod yes]

Q: Is the van that she's in your van?

A: [shake no]

Q: Were y'all fighting?

A: [nod yes]

Trooper McPherson did not see or hear anyone else talk with Dillon. On cross-examination, he stated that he was not worried about Dillon's mental capacity at that time because he was answering questions coherently and immediately, though he admitted that he was fairly sure that the man had a brain injury. He also admitted that he had had a digital-audio recorder and a smart phone with video recording capability but that he did not record the questioning. Two other officers testified to the contents of this conversation; they recalled it the same as Trooper McPherson did.

About 40 minutes after being called, emergency services arrived and took Dillon out to the road, from where he was flown to a hospital in Evansville, Indiana, where he spent the next four months.

Dillon was indicted for murder and went to trial in September 2013. The Commonwealth presented testimony from the gas-station attendant, the officers noted above, forensic personnel, and others, not all of whose testimony is recounted below. The attendant and officers testified to the events described above.

The medical examiner testified that the gunshot wounds to Dennison were both contact wounds. The gunshot wound above the right hip had a corresponding exit wound in her back. Photos admitted into evidence show that the head shot had entered approximately two inches above and behind her right ear and exited approximately two inches above her left ear.

Other forensics personnel testified that the first gunshot to Dennison, the one above her hip, had been received while she was sitting in the driver's seat, and that the blood spatter droplets in the back of the van indicated that the head shot had been fired there when she was face down on or near the floor with the shooter over her. Only one bullet was found—in the back of the van—and it had been fired from the pistol. Six empty shell-casings were found in the pistol. Another forensics witness testified that no blood could be found on the van's driver's side seat belt, overhead light, or the liner above the chair or top of the head rest.

Another police officer testified about responding to a domestic violence incident in December 2011 at Dennison's house. According to the officer, Dennison told him that Dillon struck her, and she had scratches behind her ear and on her chest. Dillon was charged with fourth-degree assault and criminal mischief, pleaded guilty to the assault on February 13, 2012, and received a 10-day sentence.

Dennison's niece, Kasey Manning, testified about being asked to remove pictures of Dillon from her Facebook page in January 2012. She also testified that Dennison had been planning to move to Indiana because she was afraid Dillon would kill her, and that she had owned a 9-mm handgun but had gotten rid of it because she did not want it used against her.

Another witness, a friend of Dennison's, testified that on January 1, 2012, she had gone to stay with Dennison, and that Dennison had been bruised, had stitches, and was incoherent half the time. She also testified about visiting Dennison and Dillon with her husband on February 28, 2012, recalling that Dennison shushed her

when she began to bring the planned move up "like she didn't want him [Dillon] to know that she was leaving." This witness testified that she did not know if Dillon knew of the planned move.

Dillon's defense theory was that the shooting was accidental or in self defense. His witnesses testified that his relationship with Dennison, while not perfect, was not bad. He put on proof that Dennison had visited him twice while he was in jail in February 2012,

A deputy in the Muhlenberg County Sheriffs Department testified about responding to a domestic call in September 2011. He did not notice any physical injuries on Dennison, though her shirt was ripped. His report stated that Dennison confronted Dillon about leaving her, and that she had assaulted him and he shoved her in response. No charges were filed.

Dillon took the stand in his own defense. He testified that he was deaf and blind on the right side, and had some memory loss. He testified about how Dennison had been upset with him about his unemployment payments being messed up, that she would make scenes at his work sites, and that she had assaulted him on New Year's Eve, smacking him and trying to hit him with a miniature baseball bat. He had responded by putting her in a headlock, and his jacket got caught in her hair. This was the event that led to the fourth-degree assault conviction noted above.

He also testified that he and Dennison had had an argument on February 28 about whether her son was mature enough to have a cell phone. He claimed that when he returned from work on February 29, Dennison told him that she wanted him to leave. He claimed to have packed up and that Dennison was to drive him to a friend's house.

Apparently the struggle with Dennison that led to her death occurred on this drive. He testified that Dennison pulled the gun on him; that as they struggled with the gun and Dennison tried to pull the trigger, his hand came between the hammer and the firing pin; and that he had never pointed the gun at her. He claimed the shots were fired as a result of the struggle as he tried to push the gun away from himself. An emergency room nurse testified that Dillon had an abrasion on his hand when he was brought in to the hospital.

Dillon put on his own forensic expert, Barry Goetz, who testified that he had viewed the van and other items, including reports from the scene and autopsy and photographs. He opined that Dennison had been seated in the driver's seat when shot in the head, with the bullet striking the seat-belt anchor. He explained that he would not expect blood spatter on the driver's side door because Dennison's hair would have caught it, and that blood got underneath the chairs from the movement of Dennison's body and hair when she was placed on the floor.

On rebuttal, the Commonwealth introduced the testimony of a police officer that the damage to the seatbelt had been from wear and tear, not a bullet.

The jury found Dillon guilty of murder, and he was sentenced to 40 years' imprisonment. He now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

On appeal, Dillon makes five claims of error: (1) that his responses to Trooper McPherson's questions should have been suppressed as involuntary; (2) that one of his cellmates while awaiting trial was improperly allowed to give hearsay testimony; (3) that the prosecutor improperly testified when questioning the cellmate; (4)

that Dennison's niece was improperly allowed to give hearsay testimony about Dennison's gun; and (5) that hearsay about Dennison's plan to move to Indiana was improperly admitted.

**1. The responses to Trooper McPherson's questions at the scene were not properly admitted in the Commonwealth's case-in-chief, but their admission was harmless error.**

Dillon first argues that the trial court erred by failing to suppress his responses to Trooper McPherson's questions at the scene. In a pretrial motion, Dillon claimed that his responses and apparent waiver of his *Miranda* rights were not voluntary, in light of his physical condition at the time.

At the suppression hearing, the Commonwealth offered only the testimony of Trooper (by then Detective) McPherson, who testified about his encounter with Dillon on February 29, 2012; this testimony closely tracked that which he later gave at trial.

After Dillon was handcuffed but still lying on the ground, McPherson saw blood coming out of his mouth and the exit wound at the top of his head. Dillon had "raccoon eyes" or puffing and bruising around the eyes. McPherson raised Dillon up and leaned him forward so the blood could drain from his mouth. He noticed the hole in the roof of Dillon's mouth, along with a lot of swelling and blood. He called emergency services and a Life Flight, and asked Dillon for his name, to which he mumbled "Lennie Dillon," because of the swelling in his mouth, which McPherson believed was the result of the substantial force from the gunshot.

McPherson squatted down next to Dillon and gave the *Miranda* warnings from memory. Dillon's eyes were swollen shut, but McPherson described him as "coherent." He based this on the fact that when

Dillon raised his cuffed hands to dig at the wound on the top of his head, he told him to put his hands down and he did. He asked Dillon if he knew where he was, what was going on, and if he understood his rights. Dillon nodded yes.

McPherson then asked the series of yes-or-no questions recounted above. He testified that he did not instruct Dillon to only nod or shake his head, but that he recognized Dillon was having trouble speaking and formed his questions so that Dillon could respond without speaking. In fact, the only time Dillon spoke was to mumble his name.

McPherson admitted that he had never before given *Miranda* warnings to a victim with a gunshot wound to the head and had not received training in how to assess brain injuries or cognitive functioning or impairment. He also acknowledged that he had a cell phone with video recording capability that day and that it was best practice to record interviews, which he did not do.

The trial court ultimately denied the motion to suppress based on McPherson's testimony. The court's findings include the following paragraphs:

Trooper McPherson noted while waiting for the medics to arrive that the defendant was conscious, though lethargic. He proceeded to ask the defendant his name, and according to the officer, in a strained voice the defendant said, "Lennie Dillon." When the defendant attempted to speak, the officer observed blood and other matter in his mouth. Trooper McPherson asked the defendant if he knew what was going on, and the defendant nodded his head "yes."

McPherson read to the defendant his Miranda rights and asked him if he understood those rights. The defendant responded non-verbally by nodding his head, signifying that he did in fact un-

derstand the rights. Trooper McPherson then asked a series of questions, including the following: Did you shoot your girlfriend? Did you shoot yourself? Are you wanting to die? Is your girlfriend Amy Dennison? In response to each of these questions, the defendant nodded his head "yes." Trooper McPherson also asked the defendant if the van that Amy Dennison was located in was in fact his van, and in response to this question the defendant shook his head "no." Finally, Trooper McPherson asked the defendant whether he and Amy Dennison had been fighting. The defendant nodded his head "yes," indicating to the officer that they had been.

In its conclusions of law, the court first addressed the voluntariness of the responses and then addressed the waiver of Dillon's *Miranda* rights. As to voluntariness, the court concluded that under the totality of the circumstances, there was no coercive activity by the police. Specifically, the court concluded:

> In light of the evidence present in this case, the Court is of the opinion that Trooper McPherson used no coercive tactics whatsoever in obtaining the incriminating statements made by the defendant. The evidence reveals that no officer on the scene used any type of physical intimidation or psychological coercion in persuading the defendant to respond to the questions at issue. It is also worth noting that Trooper McPherson's first act upon discovering the defendant's condition was to contact emergency medical services to ensure he received prompt medical attention.

Based on the lack of coercion, the court concluded that the responses were voluntary.

As to Dillon's waiver of his *Miranda* rights, the court concluded that it was effective. The court again noted the lack of coercion or intimidation. The court also noted, however, that the waiver had to be knowing, intelligent, and voluntary. The court cited the facts that Dillon, though injured, was able to respond to McPherson's commands and questions, and that his answer to the question about whether the van was his was ultimately proven correct, as evidence that Dillon was aware of what was going on. With this in mind, the court concluded that even though Dillon was severely injured, he "comprehended the questions posed by Trooper McPherson, as well as the Miranda rights the officer read to him," and that he "indicated to Trooper McPherson that he understood those rights and then continued to respond intelligently to questions."

■■■ A statement obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), such as by an ineffective waiver, is generally inadmissible but may be used for impeachment. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). But "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." *Id.* This is the case "even though there is ample evidence aside from the confession to support the conviction," *id.* (quoting *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)), and "without regard for the truth or falsity of the confession," *Jackson*, 378 U.S. at 376, 84 S.Ct. 1774. Thus, we examine separately whether Dillon acted voluntarily (i.e., without being coerced) when he responded to McPherson's questions and whether he knowingly, voluntarily, and intelligently waived his *Miranda* rights in so doing.

■■■ In undertaking that review, we defer to the trial court's findings of historical facts under the clear-error standard. *Buster v. Commonwealth*, 364 S.W.3d 157, 162 (Ky.2012). Though the U.S. Supreme

Court has, in the past, stated that the ultimate question of voluntariness is also a fact question, *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), it has more recently stated that a reviewing court is not bound by the lower court's conclusion and instead "is under a duty to make an independent evaluation of the record." *Mincey*, 437 U.S. at 398, 98 S.Ct. 2408; *see also Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) ("It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness."). The same standard applies to the related questions of knowingness and intelligence of a waiver. Thus, the questions of voluntariness, knowingness, and intelligence are determined *de novo*, *Buster*, 364 S.W.3d at 162.

■ We examine the voluntariness of the statements first because this claim holds the potential for the broadest remedy for Dillon: the complete suppression of his statements for all purposes. Unfortunately, there is no bright-line test, "no talismanic definition of Voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth*, 412 U.S. at 224, 93 S.Ct. 2041. At its most basic, a voluntary statement is "the product of a rational intellect and a free will." *Mincey*, 437 U.S. at 398, 98 S.Ct. 2408. That question is a complicated one where the accused is suffering the effects of trauma or illness, as was Dillon.

The U.S. Supreme Court has addressed voluntariness in a similar context in *Mincey*. The defendant in that case was seriously wounded in a shoot-out with a police officer in the course of a drug buy gone wrong. *Id.* at 388, 98 S.Ct. 2408. He was taken to the hospital and placed in the intensive care unit. *Id.* at 396, 98 S.Ct. 2408. He had damage to his sciatic nerve and partial paralysis in his right leg; had tubes in his throat to help him breathe and in his stomach to keep him from vomiting; had been catheterized; and was receiving various drugs. *Id.*

Police questioned him a few hours after the shooting while he was still being treated. *Id.* He could not talk because of the tubes, and instead responded to questions by writing on a piece of paper. The officer read him the *Miranda* warnings and then questioned him over the course of four hours, even though he "asked repeatedly that the interrogation stop until he could get a lawyer." *Id.*

The Court described the circumstances of the interrogation as follows:

> He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to [the officer] that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while [the defendant] was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of [the officer], unable to escape or resist the thrust of [the officer's] interrogation.

*Id.* at 398–99, 98 S.Ct. 2408 (footnotes omitted). The Court stated of these circumstances that "[i]t is hard to imagine a situation less conducive to the exercise of

'a rational intellect and a free will.'" *Id.* at 398, 98 S.Ct. 2408.

Dillon first argues that because the medical records could be interpreted to show that he was in a coma when he was first treated in the air-flight ambulance and when he reached the hospital, it must be inferred that he lacked the rational capacity and free will to make any intelligent responses to McPherson's questions forty minutes earlier. But there are evidentiary problems with this argument. As evidence that he was actually in a coma in the ambulance and at the hospital, Dillon cites only his score on an awareness-level rating scale, called the Glasgow Coma Scale,[2] that includes, among other factors, whether a patient is able to open his eyes. But, for example, his score did not take into account whether his inability to open his eyes came from a neurological injury or other physical factors such as swelling, which Dillon had. For that reason, commentary about the use of the scale questions its applicability when physical injury preventing eye opening is the cause or affects one of the other factors.[3] But regardless of whether he was in a coma or not when in the ambulance or admitted to the hospital, Dillon did not present the court with any scientific evidence, such as expert testimony, by which a court could apply the scale to assist in determining what his mental state had been some forty minutes before. Dillon's argument requires the court to speculate that he was in the same condition at the scene as he was

when he was treated in the ambulance or when admitted, and the testimony of McPherson and two other troopers refutes this. His proof on this matter is not sufficient.

But Dillon also argues that his circumstances were sufficiently like those of the defendant in *Mincey* as to demonstrate the involuntariness of his responses to Trooper McPherson's questions. He notes that he had just suffered a devastating gunshot wound to his head, that he was in pain, and that he appeared to have been acting only reflexively when officers first approached him. He argues that he was "weakened by pain and shock," could not see, had been handcuffed, and was choking on his own blood.

But a statement is not involuntary—the suspect's will is not always overborne—simply because he is questioned while in pain *See, e.g., United States v. George,* 987 F.2d 1428, 1430 (9th Cir.1993); *cf. Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental condition alone does not by itself determine the issue of voluntariness). Indeed, " 'there is no rule against interrogating suspects who are in anguish and pain,' [though] the police 'may not prolong or increase a suspect's suffering against the suspect's will' nor 'give the impression that severe pain will be alleviated only if the declarant cooperates.' " *United States v. Mayhew,* 380 F.Supp.2d 915, 923 (S.D.Ohio 2005) (quoting *Chavez v. Martinez,* 538 U.S. 760, 796–97, 123 S.Ct. 1994,

---

2. The Glasgow Coma Scale is a tool used by neurosurgeons and other health care professionals to assess head injuries. *See* Graham Teasdale et al., *The Glasgow Coma Scale at 40 years: standing the test of time,* 13 The Lancet Neurology 844, 845 (Aug.2014). It takes into account three measures: eye opening, verbal response, and motor response, with a numerical value being given for each. *Id.*

3. For examples of such questioning, see Teasdale et al., *supra,* at 848 (noting that various factors can confound use of the scale); Debra Fairley et al., *Using a coma scale to assess patient consciousness levels,* Nursing Times, at 38 (June 21, 2005), *at* http://www.nursing times.net/using-a-coma-scale-to-assess-patient-consciousness-levels/203819.article (noting that eye swelling can render the eye-opening factor meaningless).

155 L.Ed.2d 984 (2003) (Kennedy, J., concurring in part and dissenting in part)).

This Court's predecessor agreed that the "[s]ickness, ill health, or injury of the accused will influence his will to resist, and hence he will be more prone to the overbearing influence of techniques of improper questioning." *Allee v. Commonwealth,* 454 S.W.2d 336, 341 (Ky.1970). But the emphasis is still on the police's use of overbearing influence or improper questioning, as it was in *Mincey. See also Connelly,* 479 U.S. at 164–65, 107 S.Ct. 515 (noting that while mental condition is relevant, a violation occurs only if police overreach and exploit the condition); *United States v. Granados,* 846 F.Supp. 921, 926–27 (D.Kan.1994) (same).

Clearly, Trooper McPherson did not employ any of the coercive methods described in *Mincey.* His questions were brief, simple, and related to the scene that he and the other officers had come upon. He immediately called for medical assistance for Dillon.

Moreover, when Trooper McPherson noticed that Dillon was choking or gurgling on his own blood, he sat the man up in an effort to assist his breathing. Far from exacerbating the situation to press his advantage, the officer attempted to assist Dillon. The only arguably coercive action he took was handcuffing Dillon. But that action was for the purpose of officer safety as Dillon could have had another gun on his person, and by itself is insufficient to render Dillon's answers involuntary.

The simple fact is that *Mincey* and similar cases require a combination of pain or physical trauma and police overreaching before a confession or statement will be found to be involuntary. *Abela v. Martin,* 380 F.3d 915, 928 (6th Cir.2004). Here, there is no evidence of police overreaching or improper questioning, other than the fact that they questioned so severely injured a man at all. However, the questions were relevant to finding out what had happened.

Dillon also cites *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (per curiam), in which the Supreme Court held inadmissible statements made while the defendant was in pain in the hospital, under the influence of drugs, and at the mercy of prison hospital authorities. He suggests that this case stands for the proposition that being in significant pain and in custody, even without overreaching, are sufficient to prove the involuntariness of a statement. But in that case, the hospital stay was part of a continuous "stream of events," *id.* at 38, 88 S.Ct. 189 (quoting *Clewis v. Texas,* 386 U.S. 707, 709, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)), that began five days before with the defendant's being shot in the leg by officers as he fled and then being "ordered at gunpoint to speak his guilt or be killed," *id.* The police engaged in especially egregious conduct toward the defendant that can only be viewed as coercive.[4] That case,

---

4. The Court described the conduct as follows:
 The uncontradicted facts of record are these. Tennessee police officers saw the petitioner as he fled into an open field and fired a bullet into his right leg. He fell, and the local Chief of Police pressed a loaded gun to his face while another officer pointed a rifle against the side of his head. The Police Chief asked him whether he had raped and killed a white woman. When he said that he had not, the Chief called him a liar and said, 'If you don't tell the truth I am going to kill you.' The other officer then fired his rifle next to the petitioner's ear, and the petitioner immediately confessed. Later the same day he received an injection to ease the pain in his leg. He signed something the Chief of Police described as 'extradition papers' after the officers told him that 'it would be best ... to sign the papers before the gang of people came there and killed' him. He was then

therefore, is readily distinguishable from this one, as there is no conduct even remotely resembling that of the officers in *Beecher*.

Still, Dillon's injuries were arguably far worse than that of defendants in cases such as *Mincey* where courts have found statements to be involuntary. And like in those cases, his situation was not one "conducive to the exercise of 'a rational intellect and a free will.'" *Mincey*, 437 U.S. at 398, 98 S.Ct. 2408. But in those cases, the terrible pain and trauma that left the defendants vulnerable was accompanied by coercive police conduct—improper or overreaching questioning—that took advantage of the vulnerability and exploited the situation. There was no such conduct in this case.

That Dillon was severely injured was only one of the circumstances surrounding the questioning. In light of the totality of those circumstances, we cannot say that the trooper overbore Dillon's will or otherwise coerced him into answering the questions put to him. *See United States v. Mayhew*, 380 F.Supp.2d 915, 927 (S.D.Ohio 2005) (holding statements voluntary despite being given during ambulance ride after self-inflicted gunshot wound to the chest). His statements were made without undue coercion, and were therefore voluntary.

That does not mean, however, that his statements were properly admitted because Dillon also claims his waiver of his *Miranda* rights was ineffective. Whether Dillon's statements were voluntary is a different question from whether he effectively waived his *Miranda* rights. And the effect of Dillon's severe condition as regards the claimed waiver of his *Miranda* rights requires a different analysis. To be effective, such a waiver must be made "voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That inquiry has two parts, both of which must be shown by the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Taken together, these inquiries require something more than merely ascertaining whether Dillon was willing to answer simple questions put to him by the officer without coercion. His statements may be voluntary under the first inquiry while the apparent waiver of his rights in making

taken by ambulance from Tennessee to Kilby Prison in Montgomery, Alabama. [Five days later], the petitioner's right leg, which was later amputated, had become so swollen and his wound so painful that he required an injection of morphine every four hours. Less than an hour after one of these injections, two Alabama investigators visited him in the prison hospital. The medical assistant in charge told the petitioner to 'cooperate' and, in the petitioner's presence, he asked the investigators to inform him if the petitioner did not 'tell them what they wanted to know.' The medical assis-

tant then left the petitioner alone with the State's investigators. In the course of a 90–minute 'conversation,' the investigators prepared two detailed statements similar to the confession the petitioner had given five days earlier at gunpoint in Tennessee. Still in a 'kind of slumber' from his last morphine injection, feverish, and in intense pain, the petitioner signed the written confessions thus prepared for him. *Beecher v. Alabama*, 389 U.S. 35, 36–37, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (footnote omitted, ellipsis in original).

such statements can be unknowing and unintelligent under the second inquiry. That is the case here.

We cannot say from this record that Dillon had a full awareness of his right to remain silent or what consequences would follow if he answered the trooper's questions. The Commonwealth must show that Dillon understood his rights, that is, that his voluntary waiver was also knowing and intelligent. The "totality of the circumstances surrounding the interrogation" must show "the requisite level of comprehension [before] a court [can] properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

While Dillon was able to give his name in response to a question, followed commands, and was able to answer questions, including a question the answer to which was later independently verified, these were simple yes-or-no questions that required very little analysis. The effect of waiving the right to remain silent is a far more complex concept, as is the waiver of right to counsel. There is no question that Dillon was severely injured and suffering from anxiety and anguish, though his actions indicate that he was aware of his surroundings and understood what the officer said to him *to some degree* when asked a simple question.

The Commonwealth's burden in showing a proper waiver is a heavy one, though it "is not more than the burden to establish waiver by a preponderance of the evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 395, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). While Dillon was not required to "understand every possible consequence of a waiver of the Fifth Amendment privilege," *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), and was entitled only to be informed that he was not required to respond to police questions, could have counsel present, and could stop responding at any time, there is nothing that indicates Dillon was capable of integrating these three points in a manner that would allow him to realize that his answers would be used against him in court.

The ability to correctly answer the question about whether he owned the van required only knowledge of one fact: the van was not his. Proof that his mind at that point was capable of correctly answering that simple inquiry is not proof that he was also capable of understanding what the effects of his waiver were. He was asked only if he understood the *Miranda* warnings, and he nodded yes. The nod, however, does not satisfy the Commonwealth's "heavy burden" of showing that his waiver was knowing and intelligent. The decision to waive the right to remain silent and to have counsel has legal consequences that require a greater level of "intelligent" decision-making than simply nodding yes or no to simple questions while suffering the effects of a massive head trauma. There must be evidence that there is a "full awareness" of the right to remain silent and the "consequences" of waiving it. The facts do not establish this.

It may be that this level of proof in situations where a defendant is as profoundly injured as Dillon was here is a burden that the Commonwealth simply cannot carry. It is clearly difficult to show the effects of such an injury on the brain. But it is no more presumptuous to assume that Dillon could not process these concepts adequately, given his severe condition, than it is to assume that he could do so because he could nod an answer to simple, linear questions.

On this closer question, what do the totality of the circumstances show here? Dillon was found on the ground, shot, and at first not responsive. His hands were jerking. He did not answer the officers as they came upon the scene. He was hand-cuffed, and then raised to a sitting position so the blood could drain out of his mouth. His mouth was full of blood and tissue, and the only words he spoke were to mumble his name. He had a hole in the roof of his mouth, and an exit wound on the top of his head. His eyes were swollen shut. He could respond to short yes-or-no questions. But could he reasonably be thought to understand that he was being interrogated for a murder charge, or understand that he might need the advice of counsel?

It may be that he thought he was going to die anyway, and wanted to confess. Or it may be that he had just enough compre-hension that he could grasp simple con-cepts, but not more complex ones. The problem is that either position is specula-tive. This does not meet the Common-wealth's burden of showing by a prepon-derance of the evidence that he knowingly and intelligently waived his rights under *Miranda*. The statements should have been suppressed. Thus it was error to allow his responses to McPherson's ques-tions to be admitted in the Common-wealth's case-in-chief.

 But such an error, even though it implicates Dillon's constitutional rights, does not automatically require reversal of his conviction. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Reversal is not required if the error complained of is harmless beyond a reasonable doubt. *Id.; see also Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("[T]he stan-dard for determining whether a conviction must be set aside because of federal con-stitutional error is whether the error 'was harmless beyond a reasonable doubt.' ").

Dillon testified at trial to facts consistent with the answers he gave to McPherson's questions. He admitted to having a rela-tionship with the victim, to having a quar-rel with her that day, and that they had struggled with the gun when it went off and shot her in the head. In his version of events, her death was an accident. The only potentially incriminating statement he made in response to McPherson's ques-tions was that he "killed" her. But he never denied having killed her, even on the stand. And in his statement, he did not admit to *murder*. The statements he made were not inconsistent with his de-fense. Thus standing alone, we cannot say that the admission of the statements would require reversal on this record. Their ad-mission was harmless beyond a reasonable doubt.

**B. Cellmate's testimony**

Dillon also alleges two errors related to the testimony of one of his former cell-mates, Brad Saulsberry, about a conversa-tion that Dillon allegedly had with another cellmate. Specifically, he alleges that this testimony included improper hearsay in that it recounted statements made by the other cellmate about what Dillon had done, and that the prosecutor improperly im-peached Saulsberry by injecting his own knowledge of a prior conversation with Saulsberry and thereby effectively becom-ing a witness.

Saulsberry had been in the same cell at the Muhlenberg County Detention Center With Dillon. In fact, his bunk was over Dillon's. He claimed to have overheard a conversation between Dillon and another cellmate, Arlen McIntosh, one night when he was in his bunk. When asked at trial what he had heard, rather than repeating what he heard, Saulsberry initially at-tempted to summarize the conversation,

saying: "I just heard that, you know that, where they got the gun from. Well, I didn't hear where they got the gun from. I just heard that they got a gun from somebody and what he did, what he was supposed to have been doing, or what he was supposed to did, or something like that." The prosecutor then asked him to repeat what he had actually heard. He said, "That's what I heard. I heard that he was supposed to have got a gun from somebody and did what's he's supposed to done." When asked where Dillon said the gun came from, Saulsberry replied: "He said it came from out of town." When asked specifically who he had heard make the statement that the gun was from out of town, Saulsberry replied that it was *McIntosh*.

The court called a bench conference at that point and expressed concern that the witness was repeating McIntosh's statements. To remedy this, the court admonished the jury, stating:

> Ladies and gentlemen, you heard testimony from Mr. Saulsberry containing statements that were made by a Mr. McIntosh. Those statements are hearsay and are not to be considered by you in any manner whatsoever in rendering your verdict in this particular case. Concerning statements that he overheard in a jail cell, statements that were made by Mr. McIntosh, those are to be disregarded by you. That is not competent evidence.

After that, the prosecutor told Saulsberry that he only wanted him to repeat what Dillon had said, to which he replied:

> I never heard Mr. Dillon say anything. It was Mr. McIntosh talking. They was talking to each other. Mr. McIntosh was talking to, you know, I never heard from his mouth that he did it. Mr. McIntosh and him was talking about, you know, where they, or where he was

going to do it at or where he, you know, was going to the deer stand.' I never heard it come out of his mouth that he killed that girl. Never heard that.

The prosecutor then asked, "You never heard a statement said by Lennie Dillon that night. Is that correct?" Saulsberry replied, "Yes."

The prosecutor then asked Saulsberry where he and the prosecutor had first made contact, apparently intending to impeach Saulsberry, and the defense objected. At that point, the defense complained that all of the statements Saulsberry had repeated had been McIntosh's, not Dillon's, and moved to strike the witness and that the jury be instructed to ignore all of his testimony. The court instead said it would allow the prosecutor to impeach the witness.

The prosecutor went back to his examination, and the following exchange took place:

Q: Mr. Saulsberry, do you have memory problems?

A: No, sir. No, I don't.

Q: Do you recall back in June of this year, sir, that you had someone while you were in this courtroom—

A: Yes.

Q: —you had someone contact me and said you needed to speak with me?

A: Yes.

Q: And at that time, you made certain statements to me regarding knowledge you had about this case?

A: Yes. But I never said that Mr. Dillon said anything. All I said, that I heard a conversation between Mr. Dillon and Mr. McIntosh.

Q: And I asked you at that time, what you wanted in exchange for your testimony trying to make a deal,

and you said you didn't expect any favors?

A: No.

Q: Is that correct?

A: No.

Q: Did you not tell me at that time that that conversation, that you heard Lennie Dillon say that he would have gotten away with it if he hadn't got stuck in the mud?

A: I said, yes, I did say that, that he got stuck in the mud, yeah.

Q: Said by Lennie Dillon?

A: Said by Lennie Dillon.

Q: Did you not also say, sir, that you heard Lennie Dillon say he was going to bury her at the deer stand?

A: They was both talking about that.

Q: Did you tell me in June of this year that you heard—

A: Yeah, because he's the one that's in trial, yeah. They was both talking about it.

Q: Did you hear him also say that night that he, Lennie Dillon, killed her because she was leaving him because she was tired of him beating on her?

A: Yup. That's what they was talking about. They was talking about it, yes.

Q: You heard Lennie Dillon make those statements—

A: I heard both of them say that, yeah. I can't say that he said it, no. I can say that they was both talking about it. Yes, they was both talking about it. Yes, they was.

Q: Did you not give a signed statement—

A: Yes, and that's what I told you on the statement. Yes, that's what I said.

Q: Are those true? Is that what you heard?

A: They was talking about it. Yeah.

Q: Those were the words that you heard—

A: Yeah.

Q: —Lennie Dillon say?

A: And I also told his lawyer that he told me, three months, I mean three weeks after that that he told me outside that he didn't do it. I also told them that too. The lawyers that he had.

Q: You spoke with his lawyers as well?

A: It was another woman out of their [pointing toward the defense table] out of their firm, I guess.

Q: But again, whatever the truth is—

A: Yes, the same thing I told you yesterday.

Q: —you heard Lennie Dillon make those statements late at night—

A: I heard both of them talking about it. Him and Mr. McIntosh talking about it. Yes.

The prosecutor then sat down, and Dillon's counsel cross-examined Saulsberry.

We address each of Dillon's claims about this testimony in turn.

**1. Introduction of the hearsay content of Saulsberry's testimony was error, though it was not by itself reversible.**

 Dillon first complains that Saulsberry's testimony consisted of impermissible hearsay about what McIntosh, the other cellmate, said in his conversation with Dillon. Saulsberry's testimony is less than clear, consisting largely of his summary of conversations and statements, but there is no mistaking that at various points in his testimony, he repeated statements made by McIntosh. And those statements appear, in turn, to be repetitions of what

Dillon allegedly told McIntosh (though, again, this is less than clear).

To the extent that Saulsberry was repeating McIntosh's statements, he was giving impermissible hearsay testimony.[5] The trial court recognized this, *sua sponte* calling a bench conference the first time that Saulsberry said what McIntosh said. At that point, the court admonished the jury. But Saulsberry continued to testify in this vein, being evasive about who said what and saying that both men had been talking about the killing while also claiming that Dillon never said any of the incriminating statements.

Rather than contesting that the hearsay testimony was in error, the Commonwealth instead argues on appeal that it was harmless. The Commonwealth relies primarily on the trial court's admonishment to the jury to disregard McIntosh's statements that Saulsberry repeated, arguing that juries are presumed to have followed such admonitions. The Commonwealth also argues that Saulsberry's testimony was a minimal part of the trial, 20 minutes out of a 20–hour trial, and that it paled in comparison to other evidence of Dillon's guilt, including the blood-spatter evidence, which was the focus of the Commonwealth's case, and evidence of Dillon's prior violence toward the victim. Ultimately, the Commonwealth argues, the hearsay had no substantial influence on the jury.

The Commonwealth is correct that not all errors require reversal of a conviction. Criminal Rule 9.24 states that "[n]o error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict ... unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." The rule specifically commands that "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."

We have interpreted this rule to mean that "[a] non-constitutional evidentiary error such as this one is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Harris v. Commonwealth*, 384 S.W.3d 117, 125 (Ky. 2012). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (alteration in original).

The Commonwealth's main argument is that the trial court's admonition cured any error. Of course, "[a] jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003). But this presumption is not without exception.

The presumption does not apply "when the question was asked without a factual basis *and* was 'inflammatory' or 'highly prejudicial.'" *Id.* at 441. The Commonwealth was not intentionally seeking to elicit hearsay testimony, having pretty clearly expected Saulsberry to repeat Dillon's statements. Thus, the Commonwealth had a factual basis for its questions.

---

5. The second level of hearsay, Dillon's statements, on the other hand, would not be barred by the hearsay rule because it would fall under KRE 801A(b).

The presumption also does not apply "when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant." *Id.* This Court cannot say that there was an overwhelming probability that the jury was unable to follow the trial court's admonition to ignore Saulsberry's statements about what McIntosh had said.

This inquiry is made somewhat more difficult by the fact that some of the hearsay testimony came *after* the court's admonition was given. Ordinarily, a successful objection and resulting admonition would mean that the inadmissible testimony would cease. But here, the prosecutor sought to impeach Saulsberry, which resulted in his saying several more times that *both* men had been discussing the murder. That, however, does not render the admonition ineffective (though it may suggest another error, improper impeachment, discussed below). The jury was directed specifically to disregard testimony about what McIntosh supposedly said.

But even if we were to conclude that the jury would have had difficulty following the admonition, this testimony fails the second part of this exception, namely, that there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant. Having reviewed Saulsberry's testimony, this Court concludes that it was of little help to the prosecution, which appears to have gotten much less than it bargained for. Saulsberry initially framed his testimony by saying that the discussion between Dillon and McIntosh concerned what Dillon was "supposed" to have done, that is, what he was alleged to have done. Far from an admission, that is simply a discussion of the charges. Of course, Saulsberry went fur-

ther than that by putting more substantive statements into McIntosh's mouth, such as that the gun used in the shooting was from out of town. But Saulsberry's testimony is far from clear. The Commonwealth describes him as "a difficult and somewhat confusing witness," which is an understatement.

But to the extent that Saulsberry's "testimony" might have actually helped the Commonwealth, it was in the statements recounted by the prosecutor in an attempt to impeach him. Any error with respect to those statements, which repeated what Dillon allegedly said, was not in a violation of the bar on hearsay but that on improper impeachment. That brings us to Dillon's related claim.

## 2. The prosecutor's impeachment "testimony" was error but was not palpable error.

Dillon also alleges that the prosecutor, by introducing his own interaction with Saulsberry in an attempt to impeach the man, improperly became a witness.

Dillon's counsel, however, did not object to this impeachment method. Dillon therefore is not entitled to the benefit of harmless-error review, which requires only a showing that the error had a substantial effect on the verdict. Instead, the alleged error can only be reviewed if it rises to the level of palpable error. RCr. 10.26. "A palpable error is clear and plain, affects the substantial rights of a party, and is more likely than other ordinary errors to affect the outcome of the case." *McCleery v. Commonwealth,* 410 S.W.3d 597, 605 (Ky.2013).

The prosecutor's chosen method of impeachment was clearly and plainly error. *See Holt v. Commonwealth,* 219 S.W.3d 731, 735 (Ky.2007) (condemning the practice). Indeed, this has been the law in Kentucky for more than 125 years. See

*Commonwealth v. Cook,* 86 Ky. 663, 7 S.W. 155, 155 (1888) ("The conduct of the commonwealth's attorney was very reprehensible, and he should have been punished by a heavy fine. It is the duty of a commonwealth's attorney to represent the interest of the commonwealth fully and fairly, with his utmost ability; but it is not his duty to make a statement of fact, the credence of which is always more or less strengthened by his official position, outside of the record or evidence, which may tend in the least degree to prejudice the rights of the accused."). The practice violates the Rules of Professional Conduct. *See* SCR 3.130–3.4(e) ("A lawyer shall not ... in trial ... assert personal knowledge of facts in issue except when testifying as a witness...."); SCR 3.130–3.7 (generally prohibiting a lawyer from acting as an advocate at trial where the lawyer is likely to be a necessary witness); *see also Holt,* 219 S.W.3d at 732–33 (construing such conduct as violating these rules). It "also violates KRE 603 and KRE 802," *Holt,* 219 S.W.3d at 737 (footnote omitted), in that the lawyer is making factual assertions without having been sworn and is employing hearsay. And where, as here, the lawyer making the statements is the prosecutor, the error "goes to the heart of fundamental fairness and due process of law." *Id.* at 739. Thus, the error is a constitutional one, and not just an evidentiary one.

In short, there is "no doubt that assertions of fact from counsel as to the content of prior conversations with witnesses have the effect of making a witness of the lawyer and allowing his or her credibility to be substituted for that of the witness," *id.* and the "practice is improper and, subject to harmless error review, is an appropriate basis for reversal," *id.* at 738. Worse still, *Holt,* one of the leading cases on this issue in Kentucky, addressed facts almost identical to those here: the testimony was from

a jailhouse informant called by the prosecutor in the case-in-chief, and upon receiving unexpected answers, the prosecutor tried to impeach the witness by referring repeatedly to a prior conversation with the witness.

It has been suggested that the prosecutor's conduct was justified because impeachment by a prior statement requires only that the witness be apprised of the time and place of the prior statement, and that the examiner ask the questions in good faith, all of which the prosecutor here did. That is sufficient for admissibility under KRE 613. That, however, does not mean that the examiner's chosen method of bringing those facts to the witness's attention are allowed. Here, the prosecutor specifically (and repeatedly) referenced a conversation between himself and Saulsberry as the source of the statements, with the prosecutor repeating the statements in most instances. Only near the end of his direct examination did the prosecutor refer to a signed statement made by Saulsberry. Up until that point, he was relying on his own unsworn repetition of Saulsberry's statements to confront the man; he was not relying on the signed statement, which would have been proper.

The dissent suggests that we are out of touch with reality in this regard and that we are requiring the impossible of prosecutors, who may not always have ready access to a third party, such as an investigator, to witness the statements and later offer them as impeachment evidence. But we are talking about fundamental fairness. That fairness is not always easy to achieve is certainly not grounds for setting it aside. Moreover, in the rare instance where a prosecutor is the only source of the impeachment evidence, he simply has to make a choice: proceed without the evidence, or step aside and allow someone else to prosecute the case. If the prosecu-

tor makes the latter choice, he may testify without any problem because he will repeat the statements under oath and be subject to cross-examination.

But such an extreme practice was unnecessary here. Indeed, it appears that the prosecutor had no need to resort to referencing his own conversation with Saulsberry. Although he may not have had a third-party witness to the conversation, he appears to have had Saulsberry's own signed statement. Had he confronted Saulsberry with that, we doubt there would have been any error at all. The problem was not in the content of the impeachment evidence but in its manner of introduction. Rather than, for example, asking Saulsberry whether he had signed a statement in which he claimed Dillon said that he would have gotten away with it if he hadn't got stuck in the mud, the prosecutor injected himself, and his own unsworn recounting of Saulsberry's statement, by asking whether Saulsberry had told *him* that Dillon had made such a statement. For the prosecutor to assert a fact—that Saulsberry had made a statement to him—thereby putting his own integrity into play, is error, plain and simple.

The dissent also suggests that *Holt* made up the rule we now apply out of whole cloth because *Cook*, the 1888 case on which *Holt* relied, was not about impeachment. There is little question that *Cook* was not about impeaching a witness in the typical sense. But that misses the point. *Cook* was about the prosecutor, "in the presence and hearing of the jury," 7 S.W. at 156, offering his own unsworn statements as evidence, regardless of whether

that evidence is used to impeach, as here and in *Holt*, or to show that witness did not deserve a fee because he lied, as in *Cook*.[6]

The rule, as laid out in *Cook*, is that such "evidence" may not be heard by the jury, regardless of the context. As *Cook* noted of the prosecutor's conduct:

[H]e is not excusable in making any statement of fact outside of the evidence which may be in the slightest degree prejudicial to the rights of the accused. In this case, the commonwealth's attorney, not as a witness, made a statement of fact which flatly contradicted the he minds of the jury, of perjury. There was a plain course for the commonwealth's attorney to pursue—either to introduce himself or Judge Horman as a witness to contradict; but, not seeing proper to take this course, he should have kept silent as to what occurred in the witness-room, for the reason that a repetition of it, not under oath, in the hearing of the jury, was incompetent evidence, and of a character very damaging to the rights of the appellant, and which doubtless left an unfavorable impression on the minds of the jury, notwithstanding the admonition of the court.

*Id.*

That the error is obvious, however, is not the end of the palpable-error inquiry. Reversal for such an error will not be granted unless "it can be determined that manifest injustice, i.e., a repugnant and intolerable outcome, resulted from that error." *McCleery*, 410 S.W.3d at 606.[7] We

---

6. Of course, this was a kind of impeachment, although for collateral purposes. Rather than trying to show the jury that the witness was lying or mistaken as part of showing the defendant's guilt, the prosecutor was instead trying to show to the *court* that the witness was lying to deny him a fee.

7. Dillon suggests that under *Holt*, reversal is required if there is a reasonable possibility that the evidence contributed to the verdict. That, however, was the standard applicable to preserved error, that is, a version of the harmless-error test. Because there was no objection, the applicable standard is the high-

have described this as a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). Alternatively, we have described such errors as those that are "shocking or jurisprudentially intolerable." *Id.* at 4.

This Court concludes that the error did not create a manifest injustice. Saulsberry's testimony was confusing at best. The prosecutor's attempt to impeach him, though erroneous in form, had little substantive effect in this case. We cannot say that it caused a repugnant and intolerable outcome or a probability of a different result, or that it was an error so fundamental as to threaten Dillon's entitlement to due process of law. The error, therefore, was not palpable.

**C. Dennison's niece should not have been allowed to repeat Dennison's statement of why she no longer had a gun, but the error was harmless.**

▉▉▉▉ Dillon also claims the trial court erred in allowing Dennison's niece, Kasey Manning, to testify that Dennison told her she had gotten rid of her gun, a 9mm pistol, because she did not want anyone to use it against her. Manning testified that she noticed that Dennison's gun was missing from its usual place when she was helping Dennison clean her car. Manning asked her where the gun was, to which she replied that she had gotten rid of it. Manning also testified that when asked why, Dennison had said it was "because she didn't want it to be used against her."

This, Dillon claims, was inadmissible hearsay. The Commonwealth argues that the testimony showed Dennison's state of mind and was admissible under KRE 803(3).

The bar on hearsay does not extend to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." KRE 803(3). At the same time, ordinarily, statements about a victim's fear of the defendant are not relevant. *See Blair v. Commonwealth*, 144 S.W.3d 801, 805 (Ky.2004). Such statements, however, are relevant where the defendant claims self-defense or accidental death, as in this case. *Ernst v. Commonwealth*, 160 S.W.3d 744, 753–54 (Ky.2005). So, at the very least, the statement was relevant.

Nonetheless, Dillon claims that Dennison's statement does not meet the state-of-mind hearsay exception because it was "a statement of past fact, not of present condition." *Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky.2002). Dillon is correct. Dennison's statement is only about her past act (getting rid of the gun) and her past mental condition (explaining why, in the past, she had gotten rid of the gun).

▉▉▉ The Commonwealth suggests that this nonetheless sheds light on her mental state at the time of the statement, but that requires an inference not allowed by the hearsay rules at issue. The state-of-mind exception is limited to a statement about a then-existing mental state or condition. The "crucial component of this [exception] [i]s contemporaneity of the declarant's state of mind and the statement describing it," and it "le[aves] no room for the use of a statement describing a state of mind that existed at some early time." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.5[2][a], at 648 (5th ed.2013). The statement cannot be about a "past fact," but must instead "cast light upon her

er palpable-error standard, which requires

more than an effect on the verdict.

future intentions," *Ernst v. Commonwealth,* 160 S.W.3d 744, 753 (Ky.2005), which includes statements of present or then-existing mental states.

Thus, the statement "I felt scared yesterday" would not be admissible, but the statement "I feel scared now" would be, if relevant to a given case. Dennison's statements were of the former variety; they were about her past mental state when she got rid of her gun. Had she followed up her explanation for getting rid of the gun with a statement about her present state of mind, such as "I don't want any guns in my house now because I am afraid they will be used against me," or her future concerns, such as "I will never have a gun in the house again," such a statement would fall under the exception and would be admissible if relevant. That is not what happened here. Dennison's statement was only an explanation about her past conduct. It was, therefore, inadmissible as a hearsay statement that did not fall under any exception.

We cannot, however, say that this error substantially influenced the jury's consideration in this case. *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009). The error, therefore, was harmless. *Id.*; *see also Harris v. Commonwealth,* 384 S.W.3d 117, 125 (Ky.2012) ("A non-constitutional evidentiary error such as this one is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.").

**D. The statements about Dennison's plan to move to Indiana were properly admitted.**

 Dennison's daughter and niece both testified that Dennison told them that she was moving to Indiana, without Dillon. The niece also testified that the reason for the move was that Dennison "was afraid that Mr. Dillon was going to kill her."

Dillon claims that these were also inadmissible hearsay.

Unlike the statements about Dennison getting rid of her gun, these statements are properly admitted under the state-of-mind exception. This is precisely the type of comment that casts light on the future rather than a past act.

Dillon objects that the statements were nevertheless irrelevant and thus inadmissible. He cites *Crowe v. Commonwealth,* 38 S.W.3d 379, 383 (Ky.2001) in which evidence that the victim wanted a divorce and intended to tell her husband (who killed her) was "within the scope of KRE 803(3)," and was relevant because it proved that the husband had a motive to kill her. Dillon claims that Dennison's statements differ from those in *Crowe* because there was no evidence that Dennison intended to tell Dillon of her plans to leave—and, in fact, the evidence showed she was trying to keep that fact a secret—or that Dillon ever found out.

But the statements' admissibility did not turn on Dennison's intent to tell Dillon that she was leaving him and moving away, nor on his knowledge of that fact before it happened. Although proof of such intent or fact would add to the probative weight of the admitted statements, it was not a prerequisite for the statements' admission. Such statements are still relevant to show a motive for the murder. *See Ernst v. Commonwealth,* 160 S.W.3d 744, 753 (Ky.2005) (approving admission of stated intent to evict defendant without accompanying statement of intent to tell him beforehand).

These statements were also relevant to prove Dennison's fear of Dillon. As discussed above, when a defendant claims self-defense or accident, as Dillon did, the victim's fear of the defendant becomes an issue in the case, and evidence of that state of mind is relevant. Dennison's state-

ments that she intended to move to Indiana out of fear of Dillon were therefore relevant.

### III. Conclusion

For the foregoing reasons, Dillon's conviction is affirmed.

Minton, C.J.; Abramson and Venters, JJ., concur. Cunningham, J., concurs in result only by separate opinion in which Barber and Keller, JJ., join.

CUNNINGHAM, J., CONCURRING IN RESULT:

I applaud the Majority in upholding the conviction in this case. I write separately to concur in the result. I respectfully disagree with some, but certainly not all, of Justice Noble's well written opinion.

I do not believe the impeachment attempts of the witness Brad Saulsberry by the Commonwealth Attorney to be error. I write to respectfully protest the criticism of the prosecutor by the Majority.

Former Chief Justice John Palmore spoke eloquently to the highly important role of the Commonwealth Attorney in our criminal justice system. *Niemeyer v. Commonwealth*, 533 S.W.2d 218, 222 (Ky. 1976). The majority opinion is impervious to the broad duties of this office, which extend in unique ways, outside the court room.

It is fair to say that every day, somewhere in this state, a prosecutor receives a request from someone to talk to him or her about important information dealing with crimes and criminal prosecution. Most times the request is in writing. More often than not it comes from inmates in jail or prison.

It is derelict for that prosecutor not to oblige the request, either personally or by a representative. The conversations most of the time prove futile. But, sometimes the information may solve a crime, or aid a prosecution. Information can sometimes protect a life. It is typical, if not the norm, for the person to insist on seeing the prosecutor alone. They are distrustful of others in the system. I perceive there to be a lack of understanding between the majority opinion and reality. The prosecutor does not always have the option of bringing a third party witness to the conversation.

Witness Brad Saulsberry requested to talk to the Commonwealth Attorney. He provided evidence of hearing the Appellant engaged in a conversation with another inmate where he made admissions of guilt. Saulsberry even signed a statement to that effect. He reaffirmed this information the day before trial. The written statement was provided to the defense, and the lawyer for the Appellant actually interviewed witness Saulsberry before trial.

The Commonwealth Attorney did his duty and called Saulsberry as a witness. He was not an articulate and concise witness. He "waffled." The definition of "waffled" is to "talk foolishly." (Webster's New Collegiate Dictionary 1973 G. & C. Merriam Co.). The term aptly fits this case because it was not so much that the witness contradicted his previous statement, but he even contradicted himself in his own erratic testimony at trial. One almost gets a headache watching his testimony. To give Saulsberry credit, he was more creative than most. He did say at times that McIntosh made the statement, then kept coming back to "they were talking." Of course, this is a "foolish" prattle, because McIntosh was not involved in the crime at all and would have no reason to be stating anything as to what happened. (Incidentally, this raises serious questions whether the statements assigned to McIntosh were even hearsay since what McIntosh said could not possibly have been

"offered in evidence to prove the truth of the matter asserted." KRE 801(c)).

KRE 613 allows impeachment of any witness through the use of a prior statement as long as the time (June) and place (court room) of the statement is provided to the witness and "when the impeaching party has acted in good faith." There is no question of good faith here, as evidenced by the signed statement of the witness. The term "good faith" is very telling. That has always been the guiding star for trial lawyers impeaching witnesses by prior statements. That is the protection against unscrupulous and dishonest lawyers from making up prior statements and getting it before the jury in their own words. As long as there is "good faith" that such prior statements were actually made, the proper impeachment method should be known by all good trial lawyers.

The esteemed professor Robert G. Lawson states that "[o]ne of the oldest and most frequently used of all credibility rules is that a witness may be impeached with evidence that he/she had earlier made statements that are inconsistent with testimony given at trial." *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 4.15[1][a], at 297 (5th ed., 2013). How can the foundation for a prior inconsistent statement be laid without the impeaching attorney stating the previous statement to the witness? That was exactly what the prosecutor did in this case. And the witness, unlike in *Holt*, admitted that he made it.

Saulsberry—in his rambling and disjointed manner—admitted that the Appellant was the one engaged in the conversation and made the incriminating evidence. The Majority erroneously treats the foundation questions of impeachment by the Commonwealth as "testimony" by the prosecutor. That could be said of many leading questions on cross examination.

In the landmark impeachment case of *Jett v. Commonwealth*, 436 S.W.2d 788 (Ky.App.1969), the prosecutor asked the witness if she had not told the sheriff "that your husband, Tex Jett, was fooling around with or taking advantage of your sister?" Surely this was not considered testimony by the Commonwealth Attorney as to what the sheriff would say. It was a necessary foundation inquiry for impeachment purposes, the same as the questions by the Commonwealth Attorney in this case.

A proper foundation for impeachment requires more than just asking if the witness made a prior statement. This Court has held that the foundation for impeachment is inadequate unless an inquiry about the contents of the specifics of that statement is made. *Fisher v. Duckworth*, 738 S.W.2d 810 (Ky.1987). Again, we are criticizing the Commonwealth Attorney in this case for doing exactly what we have required for a proper foundation. What the Majority has done today with its rationale is to strip the prosecutor of the ability to impeach a witness, simply because the statement was made to the prosecutor alone. Thus, we have seriously undermined a valuable safeguard of truth.

The Majority ignores the big distinction in this case and *Holt*. In that case, the witness never admitted making the prior statement as Saulsberry did here. That distinction is critical for two reasons. First, it was not the prosecutor testifying but, finally, the witness. And secondly, it explains why the prosecutor did not introduce the prior statement. The prosecutor no doubt perceived—as I do in viewing that testimony—that the confusing witness admitted making the statement. Furthermore, the witness admitted to the essence of the statement in his own circumlocutory testimony to what was in the statement. Remember, Saulsberry ended up stating,

"I heard Dillon saying the same thing McIntosh was saying." Was the essence of his testimony inconsistent with his prior statement? Probably not. At least the prosecutor didn't think so. It is hornbook law that an out of court statement is not admissible to impeach testimony when it is not inconsistent with the trial testimony. *Dennis v. Commonwealth*, 526 S.W.2d 8 (Ky.App.1975). Certainly there was no need, nor a basis, for the Commonwealth Attorney to be sworn as a witness.

Recognizing the bright minds and excellent scholarship of my brothers and sisters, I must respectfully disagree that their analysis "has been the law in Kentucky for 125 years.". That statement is simply inaccurate. We have essentially made up this new rule out of whole cloth in *Holt*. The centerpiece case of the 1888 *Cook* case is not about impeachment at all. The Majority admits this fact, but inexplicably asserts that distinction "misses the point."

It doesn't miss the point at all. In *Cook*, the witness had already finished testifying and was asking the judge for his witness fee. The testimony was over. Piqued by the evasive testimony the witness had given the Commonwealth Attorney, he stood up in front of the judge and jury and gratuitously and without any semblance of procedural necessity declared what the witness had said on a prior occasion. But here, when the witness was on the stand testifying, foundational rules for impeachment require the cross-examining lawyer to relate to the witness in the presence of the jury the content of the prior statement. Impeachment is not only just "the point," it creates the gaping abyss between *Cook* and this case.

Again, I commend the Majority for finding there was no palpable error in this case. I write simply to state that the prosecutor's treatment of the strange testimony of Saulsberry, was not error at all. For that reason, I concur in result only.

Barber and Keller, JJ., join.