# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: DECEMBER 16, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0289-MR

EZELL R. MILLER                                                                    APPELLANT

V.
ON APPEAL FROM GRAVES CIRCUIT COURT
HONORABLE TIMOTHY C. STARK, JUDGE
NO. 16-CR-0087 & 19-CR-0463

COMMONWEALTH OF KENTUCKY                                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Ezell Miller (Miller) was found guilty of murder, first-degree burglary, two counts of first-degree wanton endangerment, tampering with physical evidence, assault under extreme emotional disturbance, and being a first-degree persistent felony offender. He now appeals his resulting sentence of life imprisonment without the possibility of parole as a matter of right.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of February 28, 2016, police were dispatched to the home of twenty-two-year-old Lauren Alexander (Lauren). Upon arrival, one officer's body camera captured Miller standing on Lauren's porch holding her two-year-old son and two-month-old daughter. Miller immediately told the officer, "they tried to rob me, they shot my bitch." The responding officers

---

[1] Ky. Const. § 110(2)(b).

observed that the front door of the home appeared to have been kicked in. They then found Lauren, alive, on the floor in the middle of the threshold between the living room and kitchen. She had sustained a single gunshot wound to her head fired between one to four inches away according to the medical examiner's subsequent findings. She was flown to a hospital in Tennessee where she died the following day.

Miller lived in Lauren's neighborhood with his girlfriend Brianna Craft (Brianna). Miller and Lauren were never in a serious dating relationship, but they "messed around." During one of his interviews with the police, Miller stated that he would go see Lauren while Brianna was at work.

At trial, four of Miller's statements to police about what occurred the morning of the shooting were played for the jury. His first statement was taken at Lauren's home when the police first arrived; his second and third statements were formal interviews on the day of the shooting, one in the morning and one in the evening; and his final statement was a formal interview taken two days after the shooting. His first three statements included basically the same story with some variation, while his final statement was completely different from the previous three with regard to the shooting itself.

In his first three statements, Miller told police he was at a party on the night of February 27 into the early morning of February 28. Brianna picked him up to take him home, and they drove past Lauren's house on the way there. Miller saw a vehicle that was not Lauren's parked in Lauren's driveway. Miller apparently suspected, and was correct, that Lauren had a male friend

2

over.  The man, Tresviante "Mata" McCampbell (Mata), and Miller did not know each other.  Miller went to Brianna's house and then walked to Lauren's house.  He said that when he arrived at Lauren's house he kicked her front door in because he was drunk and upset.  He said that when he got there Lauren was standing in the living room feeding her daughter a bottle, and her son was asleep in a playpen in Lauren's bedroom.  In his first two statements to police, Miller said he was not upset that Mata was there.  But, in his third interview he admitted that he was mad because Lauren had lied to him by previously telling him she was not seeing Mata.  Miller alternated between saying that he and Mata "had words" and that Miller "slapped the shit out of him," and saying that he and Mata did not argue and Mata "just up and left" when Miller got there.  Miller said that a couple of minutes after Mata left, a masked man with a pistol barged into the home and told them to get down.  Miller claimed that Lauren handed him her daughter, and charged the gunman.  The gunman got nervous when Lauren charged him, accidentally shot her, and then left.

In Miller's final statement to police he said that he went to Lauren's house and, after Mata left, he and Lauren were arguing about Mata being there.  Miller said he put his gun down, and then Lauren put her baby down and went for the gun.  He said they fought over the gun and Lauren was shot accidentally.  He said he told the police "the stupidest lie" in his previous statements.

Miller also told the police that he could not call 911 after the shooting because his phone was dead, so he went to Connie Saxton's (Connie) house to

3

get either a battery or a phone charger. Connie lived next door to Lauren and testified that, prior to the events of that morning, Miller was like a brother to her. Connie said that on the morning of the shooting she woke up to three missed calls from Miller that came in at 5:47 a.m., 5:48 a.m., and 5:49 a.m., respectively. She tried to call Miller back at 6:24 a.m., but he did not answer. Very shortly after she tried to call him back, he came to her house with Brianna. He called 911 at 6:30 a.m. while at Connie's house. Connie said that Miller looked "shook up" and told her that someone had kicked in the door to Lauren's house and tried to rob him. Minutes later Miller told her that he and Lauren were wrestling for the gun and it accidentally went off.

Mata told police that he and Lauren were asleep in bed when Lauren's phone started to ring. He then heard someone outside telling Lauren to open the door, but she refused. Eventually, a man he did not know kicked in the door. By the time Mata sat up in bed, the man had a gun pointed at him.[2] The man was asking Lauren, "is this what you want? Is this the [man] you want?" Mata told Lauren to take the children and go into the kitchen, and she did. The man told Mata that he would kill him while he had the gun pointed at his face. The man eventually went into the kitchen with Lauren, and Mata got his belongings and left. Mata said the man pistol whipped him as he was leaving. Mata gave the police a description of the man that was consistent with Miller's description. He also said that Miller carried a "big gun" with an "infrared

---

[2] The doorway to Lauren's bedroom was to the immediate left of the front door.

4

beam." At trial, Mata said that he did not remember the events of that morning, did not recognize the gun, and he did not positively identify Miller.

During their investigation, the police obtained a search warrant for Brianna's home. They discovered a Glock Model 31 .357 Sig[3] with a red laser sight wrapped in a t-shirt just inside the door of the home's crawl space. Although the exact time of the shooting could not be determined, the Commonwealth posited that Miller shot Lauren just before making his first call to Connie at 5:47 that morning. And, in the forty-three minutes between his first call to Connie and the 911 call at 6:30, Miller walked to Brianna's house to hide the gun, and then went back to Connie's house with Brianna to call 911.

A firearms examiner with the Kentucky State Police testified that the spent .357 Sig cartridge case found in Lauren's home was fired from the gun found hidden under Brianna's house. In addition, forensic testing showed that blood found on Miller's jeans, shoes, and gun matched Lauren's DNA.

Miller did not present any evidence, but during closing arguments his counsel asserted that the shooting was an accident. Specifically, he implied that Lauren accidentally shot herself while she and Miller were fighting over the gun.

The jury ultimately convicted Miller of Lauren's murder and the first-degree burglary of her home. It also convicted him of two counts of first-degree wanton endangerment in relation to her two children who were present during

---

[3] The Glock Model 31 is manufactured by Glock but uses a Sig Sauer .357 cartridge.

5

the shooting, assaulting Mata under extreme emotional disturbance, and tampering with physical evidence by hiding the murder weapon. The jury further found him to be a first-degree persistent felony offender, and sentenced him to life without the possibility of parole based upon its findings that the requirements of KRS[4] 532.025(2)(a)1 and 2[5] were met.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. Prosecutorial Vindictiveness

Miller's first allegation of error is that the Commonwealth indicted him on additional charges solely because he refused to stipulate to the anticipated testimony of a Kentucky State Police forensic scientist. He therefore argues that the second indictment was the result of prosecutorial vindictiveness, and that the trial court erred by allowing the two indictments to be joined for trial.

For context, a brief overview of the pretrial timeline of this case is needed. On April 14, 2016, Miller was indicted, in pertinent part, for murder, first-degree burglary, two counts of wanton endangerment, tampering with physical evidence, and being a first-degree persistent felony offender. Nearly three years later, in January of 2019, a new Commonwealth's Attorney took office. A month after taking office, the new Commonwealth's Attorney filed a

---

[4] Kentucky Revised Statute.

[5] Specifically, the jury found that "the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions" and that "the offense of murder . . . was committed while the offender was engaged in the commission of . . . burglary in the first degree[.]" KRS 532.025(1)(a)1 and 2.

6

notice of intent to seek an enhanced penalty under KRS 532.025; specifically, life imprisonment without the possibility of parole or life imprisonment without the possibility of parole for twenty-five years. Because of this, the trial, which was originally scheduled for March of 2019, was pushed back indefinitely pending the conclusion of the defense's mitigation investigation. During a pre-trial hearing on April 19, 2019, the court set the ultimate trial date of February 4-7, 2020, without objection from the defense.

At the next pre-trial hearing on December 2, 2019, the Commonwealth announced that it intended to seek another indictment against Miller for second-degree assault and terroristic threatening for his actions against Mata. It planned to seek that indictment during the next grand jury session on December 13, 2019. The Commonwealth also put the court on notice that it was informed earlier that morning that the defense would not stipulate to evidence that was anticipated to be entered through a former Kentucky State Police forensic scientist, Erica Fite (Erica). The Commonwealth said Erica now lived in Washington, and because the defense would not stipulate, the Commonwealth had to figure out how to get her testimony in, either by deposition or getting funds to procure her presence at trial.

On December 13, the Commonwealth successfully indicted Miller for second-degree assault and terroristic threatening.[6] It then filed a motion for joinder. At the final pretrial hearing on January 1, 2020, defense counsel

---

[6] The count of terroristic threatening was ultimately dismissed.

objected to the two indictments being joined for trial. Defense counsel argued that they were now one month away from trial in a case that had been pending for years. Miller's counsel accused the Commonwealth of piling on charges at the eleventh hour and of trying Miller "by ambush." He asserted that the two new charges should therefore be tried separately. The defense never argued that joinder was improper because the Commonwealth only sought the second indictment to punish Miller for refusing to stipulate to Erica's testimony.

The trial court noted that the facts relating to the crimes against Mata were known to the defense, and that the facts set out in the new indictment could be introduced at the trial on the first indictment. In addition, the Commonwealth made its intention to seek the second indictment known on December 2, 2019, two months prior to trial. It therefore granted the Commonwealth's motion for joinder.

It has long been part of our jurisprudence that "specific grounds not raised before the trial court, but raised for the first time on appeal will not support a favorable ruling on appeal. Most simply put, a new theory of error cannot be raised for the first time on appeal."[7] Here, the factual basis for the argument Miller presents to this Court, i.e., that the second indictment was punishment for the defense's refusal to stipulate to Erica's testimony, was crystalized during the December 2 hearing. The defense had ample time to formulate that argument and present it to the trial court during the January 1

---

[7] *St. Clair v. Commonwealth*, 451 S.W.3d 597, 613 (Ky. 2014) (internal quotation marks omitted).

hearing when the motion for joinder was considered. It did not do so. We therefore hold that Miller's argument that the prosecutorial vindictiveness occurred in this case is unpreserved. Miller did not request palpable error review of this issue under RCr[8] 10.26.

Nevertheless, Miller has failed to prove that prosecutorial vindictiveness occurred. "Prosecutorial vindictiveness is a constitutional doctrine based on the premise that a person may not be punished for exercising a protected statutory or constitutional right. Prosecutorial vindictiveness can manifest itself in two ways: actual vindictiveness and presumed vindictiveness based upon the facts and circumstances of the case."[9] A presumption of prosecutorial vindictiveness is inapplicable to the pretrial setting.[10] Therefore, Miller must prove actual vindictiveness by the prosecution, meaning he must produce "objective evidence that [the] prosecutor acted in order to punish [him] for standing on his legal rights."[11] That objective evidence is not present in the record before us.

Miller also asserts that the trial court erred by granting the Commonwealth's motion for joinder of the two indictments. He contends that

---

[8] Kentucky Rule of Criminal Procedure.

[9] *Commonwealth v. Perry*, 507 S.W.3d 588, 592 (Ky. App. 2016) (internal quotation marks and citations omitted).

[10] *Hunt v. Commonwealth*, 304 S.W.3d 15, 32 (Ky. 2009) ("Because the prosecutorial conduct complained of by Hunt occurred in a pretrial setting, the presumption of vindictiveness doctrine is inapplicable."); *Commonwealth v. Leap*, 179 S.W.3d 809, 814 (Ky. 2005) ("[W]e are not disposed to extend the presumption of 'prosecutorial vindictiveness' . . . to the pretrial setting.")

[11] *Perry*, 507 S.W.3d at 592.

9

the joinder was improper because the second indictment was sought solely for vindictive purposes by the Commonwealth. Again, this was not the reason presented to the trial court by the defense, and the trial court did not have the opportunity to consider and rule on that argument. Accordingly, the issue is unpreserved, and Miller did not request palpable error review.

Regardless, the trial court did not err by granting the motion for joinder. Under RCr 9.12, "[t]he court may order two (2) or more indictments, to be tried together . . . if more than one (1), could have been joined in a single indictment[.]" In other words, "[j]oinder is proper where the two crimes are closely related in character, circumstance and time."[12] In this case, the crimes committed against Mata occurred during the commission of the crimes against Lauren and her children. Those crimes could have therefore been brought under a single indictment with the original charges, and the joinder was proper.

## B. Educating the jury during voir dire.

Miller's next allegation of error is that the Commonwealth improperly educated potential jurors on legal concepts during voir dire.

The Commonwealth began its voir dire by providing a brief overview of the facts of the case. It then began to discuss the crimes Miller had been charged with as follows:

> the defendant has been charged with the following crimes: the murder of Lauren Brooke Alexander. Under Kentucky law, a person is guilty of murder when, with intent to cause death, he

[12] *Debruler v. Commonwealth*, 231 S.W.3d 752, 760 (Ky. 2007).

10

causes the death of that person or a third person. But murder can also include when a person wantonly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person under circumstances manifesting extreme indifference to human life. The defendant is also charged with burglary in the first degree. A person is guilty of burglary in the first degree when they enter or remain in the residence of another without permission knowing they don't have permission—

The defense objected on the grounds that the Commonwealth's voir dire sounded more like an opening statement and that they had yet to ask a question. The Commonwealth responded that it could not meaningfully question the venire if it did not know the serious nature of the charges. The defense argued that those things could be covered in its opening statement, to which the Commonwealth responded, "before you can get to opening statement you have to be sure they can serve impartially on the jury, and voir dire is also a chance to educate them on the law to make sure they can do that."

The trial court pointed out that it had never seen anyone go over every element of every offense in voir dire. The Commonwealth said it did not intend to discuss every element of the offenses, and further contended that many lay people do not know the difference between burglary and robbery, nor do they know what wanton endangerment is. Therefore, discussing the elements of the crimes is reasonable. The defense responded that, if that was the case, it wanted the court to require that the Commonwealth read the statutory elements of the crimes verbatim. The court ruled: "if we could move a little quicker through the counts, I don't mind you identifying the counts. But I don't want to go into a lot of detail about it at this time." The Commonwealth then continued:

11

we were talking about burglary . . . enter or remain in a residence without permission knowing they don't have permission with intent to commit a crime, while entering they're armed with a deadly weapon. We have two counts of wanton endangerment in the first degree in this case. A person is guilty of wanton endangerment in the first degree when, manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person. Here we have two counts of endangering the life of . . . Lauren's two-year-old son, and . . . Lauren's two-month-old daughter, who were present in the home when their mother was shot in the face. We have a charge of tampering with physical evidence. Very briefly, a person tampers with evidence when they conceal or remove that evidence when they believe an official proceeding is about to begin in order to impair its availability. Here, the defendant is accused of concealing and hiding the murder weapon. Assault in the second degree, based on the intentional strike of Mr. McCampbell, "Mata," in the head with a loaded Glock handgun causing physical injury. Lastly, a count of terroristic threatening based on the threat to kill Mata. Ladies and Gentlemen that was an extremely brief description of the tragic events of this case. Throughout the trial you will hear in detail about each one of those and you will receive thorough jury instructions regarding the law. Again, I only mention it now so you can begin to understand why we're here and what this case is going to be about.

The Commonwealth did not ask any questions that related directly back to its discussion of the elements of the offenses. But it did ask the blanket question "at this point is there anything weighing on your heart that maybe I haven't thought to ask you that you know is going to make it very difficult to give the defendant a fair trial knowing what you know right now?"

As mentioned, during the side bench on this issue, the defense requested that if the Commonwealth was going to be permitted to discuss the elements of the crimes, that it do so verbatim. The defense now argues before this Court that the Commonwealth's voir dire was reversible error because it discussed

12

the statutory elements of the charged offenses. Further, the Commonwealth stated directly that its purpose was to "educate" the venire on the elements of the crimes in order to determine which of them could serve impartially on the jury. The defense never argued, as it does to this Court, that only the trial court may educate the jury on legal concepts. We therefore hold that the defense has attempted to "feed one can of worms to the trial judge and another to the appellate court," rendering this issue unpreserved.[13] Miller did not request palpable error review.

Nevertheless, while it is true that voir dire "is not an occasion for counsel to educate the juror panel regarding legal concepts,"[14] this Court has also recognized that "in order to fairly exercise the right of peremptory challenges and challenges for cause, it is sometimes necessary to introduce legal concepts to the jury panel to ascertain if any prospective juror is unable or unwilling to adhere to the concept."[15] In *Rogers v. Commonwealth*, defense counsel attempted to ask the venire about the different standards of proof for criminal and civil trials.[16] The Commonwealth objected to the question, and the defense responded that it was trying to educate the jury about the fact that criminal trials had a different standard of proof.[17] The trial court sustained the

---

[13] *Henson v. Commonwealth*, 20 S.W.3d 466, 470 (Ky. 1999).

[14] *Rogers v. Commonwealth*, 315 S.W.3d 303, 307 (Ky. 2010).

[15] *Id.*

[16] *Id.* at 306.

[17] *Id.*

Commonwealth's objection, and this Court affirmed.[18]  The *Rogers* Court

reasoned that

> Appellant's counsel . . . never suggested to the trial court that he
> wanted to inquire if any juror would be unable to follow the
> criminal standard of proof beyond a reasonable doubt or would
> instead be inclined to apply the standard used in civil trials.  Had
> he done so, the trial court's refusal to allow the inquiry would be
> subject to harmless error analysis.  Because our review of the
> record discloses that Appellant's sole purpose in raising the matter
> during voir dire was to educate the jury, rather than to elicit
> potentially disqualifying information about the jury, we conclude
> that the trial court did not err when it terminated counsel's
> discussion of the issue.[19]

In this case, the Commonwealth acknowledged that it was attempting to

educate the venire about the statutory elements of the alleged crimes.

However, it told the court that its purpose in doing so was to identify potential

jurors that could not be impartial.  Therefore, while the Commonwealth's

actions were certainly unusual, given our holding in *Rogers* and the broad

discretion afforded to trial courts in controlling voir dire,[20] we cannot hold that

the trial court erred by allowing the Commonwealth to inform the venire of the

elements of the charged offenses.

## C. Evidentiary Issues

Miller's final arguments concern the trial court's admission of several

pieces of evidence.  Namely, evidence that: (1) Lauren was afraid of Miller and

---

[18] *Id.*

[19] *Id.* at 309 (internal citation omitted).

[20] *Id.* at 306.

14

wanted to get away from him; (2) Miller stole a key from Lauren's home; and (3) Miller "stalked" Lauren before her death.

**(1)** *Lauren was afraid of Miller, wanted to get away from him, and was looking for a new place to live.*

Miller first asserts that several pieces of testimony introduced through Lauren's friends were inadmissible hearsay, and that the trial court therefore erred by admitting them. Specifically, he argues that the following statements were admitted in error: (1) Audrianna Johnson's (Audrianna) testimony that Lauren was afraid of Miller and wanted to get away from Miller; (2) Antavia Kirby's (Antavia) testimony that Lauren was afraid of Miller and wanted to get away from him but did not know how; and (3) Haley Kendall's (Haley) testimony that Lauren was afraid of Miller and wanted to find a new place to live to get away from him.

Prior to trial, the Commonwealth provided notice pursuant to KRE[21] 404(c)[22] that it intended to introduce prior bad acts testimony as part of its case in chief. In relevant part, its notice stated:

> The Commonwealth intends to call both [Antavia] and [Audrianna]
> to testify concerning a discussion they collectively had with the
> victim, Lauren Alexander, shortly before her death . . . [Antavia]
> describes this discussion as a planned conversation to address the
> safety of Lauren Alexander and the danger posed to her by [Miller].
> [Audrianna] states that this discussion happened the day before
> the shooting. [Antavia] is unsure as to the exact date but believes
> this conversation had to have occurred within 4 days of the
> shooting.

---

[21] Kentucky Rule of Evidence.

[22] "In a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." KRE 404(c).

This discussion consisted of Lauren expressing her desire to get away from the [Miller] . . . Both [Antavia] and [Audrianna] will testify that they believed Lauren feared [Miller].  [. . .]

The Commonwealth asserts that this information will be presented for the sole purpose of illustrating Lauren Alexanders' (sic) state of mind within hours of her murder.  The Commonwealth asserts that this testimony is admissible as an exception to KRE 802, the rule against hearsay, as the testimony would clearly fall under the Present Sense Impression exception . . . The Commonwealth anticipates that [Miller] will not deny his involvement in the shooting but will claim that the shooting occurred accidentally. The probative value of this testimony, as a whole, is that it enables the jury to understand how Lauren was perceiving her relationship with [Miller].

The defense filed a written objection to the Commonwealth's notice.  It argued, in relevant part, as follows:

Statement 1 (that the alleged victim wanted to get away from [Miller]) is clearly hearsay as defined by KRE 801, and does not fall within any exceptions listed in KRE 801A, 803, or 804, and therefore should be excluded.

[. . .]

Statement 4 (that both [Audrianna and [Antavia] believed that the alleged victim was afraid of [Miller]) may be admissible as lay opinion under KRE 701.  However, unlike expert opinion, lay opinion cannot be based on hearsay . . . This statement should be excluded unless and until the Commonwealth can lay [a] proper foundation for its admission.

[. . .]

Statement 6 (that the alleged victim was looking for another place to live) is clearly hearsay as defined by KRE 801, and does not fall within any exceptions listed in KRE 801A, 803, and 804, and therefore should be excluded.

On the morning of the first day of trial, the trial court made its ruling regarding the KRE 404(c) notice.  The court found that Lauren's fear of the defendant was

16

admissible under the present sense impression exception to hearsay, and the Commonwealth could accordingly admit evidence of both her fear and the basis for that fear. With that said, we now address each witness' testimony in turn.

Miller argues that the following portions of Audrianna's testimony were admitted in error:[23]

> **Q**: Tell the jury how you would describe [Lauren and Miller's] relationship.
>
> **A**: They were messin' off for a little bit. But, in the midst of it, she found out a lot of things and *she was trying her best to get away from him.*
>
> [. . .]
>
> **Q**: How close in time to February 28, 2016, was Lauren also spending time with [Miller]?
>
> **A**: *She had tried to get away from him like a couple of weeks before it happened.* She was trying to reach out to a lot of people to try to figure out how to get away from him and what would be the right way to go about doing it.
>
> **Q**: Do you know why, did she tell you why she was trying to get away?
>
> **A**: Yes, *she said that she was scared* and that he had stolen a key off of her dresser.[24]

---

[23] Miller's allegations of error regarding Audrianna's testimony were properly preserved by his written objection to the Commonwealth's KRE 404(c) notice. We will therefore review this issue for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 342 (Ky. 2018). A trial court abuses its discretion when it rules in a way that is unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

[24] (Emphasis added).

Audrianna further testified that in the weeks leading up to Lauren's death, Lauren spoke with her three times about how scared she was of Miller, and that the last time Lauren spoke with her about her fear of Miller was the day before she died.

Miller first argues that Audrianna's testimony that Lauren wanted to get away from Miller did not meet the requirements for the present sense impression exception to hearsay because Audrianna did not provide a time frame for when Lauren told her she wanted to get away from Miller other than "a couple of weeks before she died." We agree.

The present sense impression exception to the hearsay rule is housed in KRE 803(1): "The following are not excluded by the hearsay rules, even though the declarant is available as a witness: (1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." As the wording of the exception indicates, time is a key element to whether it is applicable.[25] The underlying theory of the rule is that "substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation."[26] To be a present sense impression, "the statement must be made while the declarant is observing the event,"[27] or immediately thereafter. The general statements that Lauren "was trying her

---

[25] *Jarvis v. Commonwealth*, 960 S.W.2d 466, 469 (Ky. 1998).

[26] *Id.*

[27] *Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky. 2002).

best to get away from [Miller]," and that she was trying to get away from him "a couple of weeks before" her death were not statements about Lauren's observations. Rather, they concerned Lauren's state of mind and therefore are not admissible under KRE 803(1).[28] The trial court was therefore incorrect in determining that the statements were admissible under KRE 803(1) as present sense impressions.

However, "it is well-settled that an appellate court may affirm a lower court for any reason supported by the record."[29] And, while Lauren's statements to Audrianna were not admissible as present sense impressions under KRE 803(1), they were admissible under KRE 803(3)'s state of mind exception to hearsay. Miller asserts that the statements were not admissible under KRE 803(3) because the exception only applies to someone that is about to take imminent action. We disagree. KRE 803(3) directs:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> > (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

---

[28] *See id.* (holding that the victim's mother's statement that she was scared for the victim "described her emotional state at the moment of Appellant's approach," and therefore was not a present sense impression because "she was not observing an event or condition by her statements").

[29] *See, e.g., McCloud v. Commonwealth,* 286 S.W.3d 780, 786 n. 19 (Ky. 2009).

The crucial component of the state of mind exception is not that the declarant

is about to take imminent action.  Rather, the key is the

> contemporaneity of the declarant's state of mind and the statement
> describing it . . . [the exception] leaves no room for the use of a
> statement describing a state of mind that existed at some early
> time.  The statement cannot be about a "past fact," but must
> instead cast light upon . . . future intentions, which includes
> statements of present or then-existing mental states.[30]

In *Dillon v. Commonwealth*, this Court held that a statement by a murder

victim about her intention to move to a different state without the defendant

because she was afraid of him was "precisely the type of comment that casts

light on the future rather than a past act."[31]  Here, Lauren's statements to

Audrianna that she was trying to get away from Miller cast light on Lauren's

intention to do so at some point in the future.  Therefore, the statements were

admissible under the state of mind exception to hearsay.  But that does not

end the inquiry.

Although the statements satisfy KRE 803(3), they must also satisfy the

rules of relevance.  Specifically, they must be relevant, i.e., they must have

"any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be

without the evidence."[32]  And, their probative value must not be substantially

---

[30] *Dillon v. Commonwealth*, 475 S.W.3d 1, 22-23 (Ky. 2015) (internal quotation marks and citations omitted).

[31] *Id*. at 23.

[32] KRE 401.

outweighed by the danger of undue prejudice to the defendant.[33]  The *Dillon*

Court held that the victim's statement that she intended to move out of the

state because she feared the defendant was relevant; it reasoned:

> These statements were relevant to prove [the victim's] fear of [the
> defendant] . . . [W]hen a defendant claims self-defense or accident,
> as [the defendant] did, the victim's fear of the defendant becomes
> an issue in the case, and evidence of that state of mind is relevant.
> [The victim's] statements that she intended to move to Indiana out
> of fear of [the defendant] were therefore relevant.[34]

In this case, Miller claimed that Lauren was shot accidentally during their

struggle over the gun.  Lauren's fear of Miller accordingly became an issue in

the case.  Her desire to get away from Miller was evidence of her fear and was

accordingly relevant.  Miller argues that the evidence's prejudicial effect

presumptively outweighed its probative value because the jury imposed the

maximum sentence of life imprisonment without the possibility of parole, citing

*Taulbee v. Commonwealth.*[35]  However, in this case, it is more likely that the

jury imposed the maximum sentence based on the nature of the crime, the

strength of the evidence, and Miller's criminal history.  As a result, we hold

---

[33] KRE 403.

[34] *Dillon*, 475 S.W.3d at 23.

[35] 438 S.W.2d 777, 778 (Ky. 1969).  We note that *Taulbee* solely concerned a prosecutor's inflammatory statements during closing argument, and no published case of this Court has ever interpreted it to hold that prejudice is presumed any time the maximum sentence is imposed; however, several unpublished appellate court decisions have.  *See West v. Commonwealth*, No. 2011-SC-000629-MR, 2013 WL 3155835, at *7 (Ky. June 20, 2013); *Gibson v. Commonwealth*, No. 2018-CA-001723-MR, 2020 WL 5084278, at *4 (Ky. App. Aug. 28, 2020); *Sloas v. Commonwealth*, 2015-CA-001183-MR, 2018 WL 6602098, at *4 (Ky. App. Dec. 14, 2018); *Gaunt v. Commonwealth*, 2011-CA-000132-MR, 2012 WL 876770, at *6 (Ky. App. Mar. 16, 2012).

that any presumed prejudice resulting from the admission of Audrianna's testimony was not substantially outweighed by its probative value. Consequently, the trial court did not abuse its discretion by admitting it.

Miller next argues that Audrianna's testimony that Lauren "said that she was scared" of Miller did not qualify under the state of mind exception to hearsay. In *Bray v. Commonwealth*, this Court noted that "[s]tatements of fear may be admissible pursuant to KRE 803(3)" if those statements otherwise satisfy the rules of relevancy.[36] In particular,

> [w]here a victim's state of mind is not at issue, the testimony is not allowed to be admitted into evidence. Specifically, where a defendant did not claim self-defense, an accidental death, or suicide, such statements usually have little relevancy except
>
> toward providing a strong inference of appellant's intent, actions or culpability.[37]

Here, Miller asserted that Lauren's death was accidental. And, Audrianna did not testify that Lauren told her that she was afraid of Miller at some point in the past. Rather, Lauren expressed to Audrianna her then-current feelings of fear towards Miller. Therefore, Audrianna's testimony that Lauren was scared of Miller satisfied both the state of mind exception to hearsay and the rules of relevancy. And, for the reasons already articulated, the evidence's probative

---

[36] 68 S.W.3d 375, 381 (Ky. 2002).

[37] *Id.* at 381-82 (quoting *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky. 1996), *overruled on other grounds by Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky. 2008)) (internal quotation marks omitted).

value was not substantially outweighed by any prejudicial effect it may have had. Accordingly, the trial court did not err.

Miller next argues that the trial court abused its discretion[38] by allowing Antavia to testify to the following:

**Q**: Did Lauren ever express any concerns to you about [Miller]?

**A**: Yeah.

**Q**: Can you tell the jury about those?

**A**: She was just worried a little bit, *a little scared at one point. She just kind of wanted to get out and she didn't know how.*

**Q**: How close in time to February 28 did she express those feelings to you?

**A**: Well the day before I'd actually had Audrianna come over to my house and explain some things to her.

**Q**: So you and Audrianna had a conversation with Lauren the day before she was shot?

**A**: Yes.

**Q**: And in that conversation did she express some concerns?

**A**: Yes.[39]

Miller essentially makes the same arguments against the foregoing testimony that he made against Audrianna's testimony. Namely, that Lauren's desire to get away from Miller did not qualify as a present sense impression because it

---

[38] This allegation of error was preserved by Miller's objection to the Commonwealth's KRE 404(c) notice. We therefore review it for abuse of discretion. *Mason*, 559 S.W.3d at 342. A trial court abuses its discretion when it rules in a way that is unreasonable, unfair, or unsupported by sound legal principles. *English*, 993 S.W.2d at 945.

[39] (Emphasis added).

did not involve Lauren contemporaneously describing an event or condition as she was perceiving it or immediately thereafter, and it did not qualify under the state of mind exception because that statement concerned Lauren's past condition. In addition, Miller again asserts that Lauren's fear of Miller did not qualify under the state of mind exception because it did not meet the contemporaneity requirement for that exception.

We again agree that Lauren's statements about her desire to get away from Miller did not qualify as a present sense impression, contrary to the trial court's ruling. As discussed above, the statement was not connected to an event or condition that Lauren was perceiving at that time, and therefore the requirements of KRE 803(1) were not satisfied. However, the statement clearly qualified under the state of mind exception because it demonstrated that at the time of Lauren's conversation with Antavia, she was contemplating how to get away from Miller. In other words, when Lauren expressed her desire to get away from Miller, that desire was "[a] statement of [her] then existing state of mind . . . such as [her] intent"[40] to get away from Miller. It was therefore admissible under KRE 803(3).

Similarly, and for the reasons already provided, Antavia's testimony that Lauren was afraid of Miller qualified under the state of mind exception to hearsay. Miller is correct that Antavia first says that Lauren was afraid of Miller "at one point." But she then goes on to explain that Lauren expressed

---

[40] KRE 803(3).

24

that fear during a conversation that she had with Audrianna and Antavia the day before she died. That fear was therefore expressed by Lauren while she was concurrently experiencing it, satisfying KRE 803(3).

As previously discussed, Miller claimed that Lauren's death was an accident. Therefore, Lauren's fear of Miller, and the desire to get away from him due to that fear were both relevant.[41] And we again hold that any prejudicial effect this evidence may have had was not substantially outweighed by its probative value. The trial court accordingly did not abuse its discretion by admitting Antavia's testimony.

Finally, Miller argues that admitting the following portions of Haley's testimony was reversible error:

> **Q:** Did [Lauren] ever express any feelings to you about [Miller]? Any concerns?
>
> **A:** Not until the end, before her death, no.
>
> **Q:** So, she died on February 28, 2016. Prior to that what kind of concerns did she express to you?
>
> **A:** *A few days before her murder she was expressing that she wanted to move. She didn't want to be around him anymore.*
>
> **Q:** Did she say why?
>
> **A:** *Basically, she was scared.* She wanted to get away.
>
> **Q:** She was scared of [Miller]?
>
> **A:** Yes.[42]

---

[41] *See Dillon,* 475 S.W.3d at 23.

[42] (Emphasis added).

25

We note first that, unlike Miller's arguments regarding Audrianna and Antavia's respective testimonies, his arguments concerning Haley's testimony are unpreserved. The Commonwealth did not discuss Haley's anticipated testimony in its KRE 404(c) notice, but the defense made no objection to her testimony at trial, whether on KRE 404(c) grounds or on hearsay grounds. Nevertheless, Miller has requested review of this issue for palpable error under RCr 10.26.

> We will reverse under the palpable error standard only when a manifest injustice has resulted from the error. The required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law. When we engage in palpable error review, our focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process.[43]

Based upon the same reasoning discussed *supra*, we hold that no error occurred in the admission of Haley's testimony. Again, while Lauren's desire to get away from Miller was not a present sense impression, it was a statement that qualified under the state of mind exception to hearsay. Likewise, her fear of Miller that she expressed to Haley also qualified under the state of mind exception to hearsay. And, because Miller claimed her death was an accident, both statements were relevant. Finally, the statements' probative values were not substantially outweighed by their prejudicial effect.

---

[43] *Tackett v. Commonwealth,* 445 S.W.3d 20, 26 (Ky. 2014) (internal citations and quotation marks omitted).

26

**(2)** *Miller stole a key from Lauren's home.*

Within the same KRE 404(c) notice discussed in Section II(C)(1) of this opinion, the Commonwealth stated that "[Antavia] and [Audrianna] were concerned for Lauren's safety because of prior incidents where the Defendant entered Lauren's home unannounced[.]" The defense objected to this anticipated testimony as follows: "Objection: Statement 3 (that on prior occasions of (sic) Mr. Miller went to the alleged victim's house unannounced) is inadmissible character evidence under KRE 404[.]" As discussed, the trial court ruled that evidence of Lauren's fear of Miller and the reasons for that fear were admissible. Therefore, it found that evidence that Miller would come into Lauren's home unannounced was admissible if that was one of the reasons that she feared him.

During Audrianna's testimony she stated that Lauren was trying to get away from Miller because "she was scared [and] he had stolen a key off of her dresser." The defense objected to this testimony. Defense counsel argued that it was a prior bad act that was undisclosed by the Commonwealth's KRE 404(c) notice because the notice said nothing about Miller stealing a key. The Commonwealth countered that the evidence was not being offered to prove that Miller stole a key. Rather, the Commonwealth was trying to show that he would enter Lauren's home unexpectedly and the key was the means by which he was able to do that.

The trial court ruled that the theft of the key was a prior bad act under KRE 404(b). Therefore, the court chose to admonish the jury to disregard the

27

theft of the key. The Commonwealth asked the court if it could ask its witnesses how Miller got into Lauren's house and if she ever gave him a key. The court found that it could ask those questions because it explained the basis for Lauren's fear. The trial court then admonished the jury:

> The witness has testified that there was a key that was stolen or taken. You shall disregard that as having any evidentiary value. There may be some proof later on or some testimony of him coming in the house. You can consider that as the mechanism, but the fact that a key may or may not have been taken shall not be considered as evidence in determining his guilt or innocence in the trial of this matter.

Because the trial court gave a curative admonition regarding Miller's prior bad act of stealing the key, the parameters of this Court's review are well-established. Specifically,

> [a] jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error. There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis and was inflammatory or highly prejudicial.[44]

Before this Court, Miller does not assert that there was reversible error on the grounds that the Commonwealth's KRE 404(c) notice was insufficient. Rather, he asserts that the trial court's admonition was ineffective because the Commonwealth continued to elicit testimony suggesting that Miller stole the

---

[44] *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003) (internal citations and quotation marks omitted).

28

key.  In particular he points to portions of Audrianna, Haley, and Antavia's respective testimonies.

First, Miller argues during Audrianna's testimony, the Commonwealth elicited the following:

> **Q:** Did Lauren ever tell you she gave [Miller] a key?
>
> **A:** No.

Miller next points to the following excerpt from Haley's testimony:

> **CW:** Without getting into how it may or may not have been obtained, did [Miller] have a key?  According to Lauren.
>
> **Defense:** Objection, question calls for hearsay.
>
> **CW:** We've already ruled on that about present sense impression.
>
> **Court:** I'm going to sustain the objection.
>
> **CW:** To your knowledge, did Lauren ever voluntarily give him a key to her home?
>
> **A:** No.

Finally, Miller points to the following section of Antavia's testimony:

> **Q:** To your knowledge, did Lauren ever give him a key?
>
> **A:** No.

We note that, apart from the Commonwealth's question to Haley about whether Miller had a key according to Lauren, the defense did not object to any of the foregoing portions of testimony.

As mentioned, this Court may hold that a trial court's admonition is ineffective if (1) there is an overwhelming probability that the jury was unable

to follow the admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) "when the question was asked without a factual basis and was inflammatory or highly prejudicial."[45] We hold that neither of those scenarios is present in this case.

First, there was no overwhelming probability that the jury was unable to follow this admonition. After the admonition, the Commonwealth did not elicit evidence from any other witness that Miller stole a key to Lauren's home. Instead, it asked questions that were well-within the trial court's ruling, i.e., it only asked if Lauren gave Miller a key to her home. Audrianna, Antavia, and Haley all testified that one reason Lauren was afraid of Miller and wanted to get away from him was that he would enter her home unannounced. We see no reason why the jury would not have been able to consider Miller's possession of the key, stolen or not, solely as a mechanism by which he would enter Lauren's home without her permission. Further, there is not a strong likelihood that Audrianna's testimony that Miller stole the key would have been devastating to his defense. With regard to Lauren's murder, the sole issue the jury had to decide was whether Miller shot Lauren intentionally. There was no question about Miller being in Lauren's home that morning, nor was there a question for the jury about how he entered her home. In Miller's own statement to police he acknowledged that he was present in her home that morning and that he entered her home by kicking in the door, not by use of a key. Consequently,

---

[45] *Johnson,* 105 S.W.3d at 441.

testimony that he stole a key to Lauren's home would have had no bearing on his defense that Lauren was shot accidentally.

Next, the Commonwealth never asked Audrianna if Miller stole a key from Lauren's home. The Commonwealth asked, "did she tell you why she was trying to get away?" and Audrianna responded, "[y]es, she said that she was scared and that he had stolen a key off of her dresser." Accordingly, because there was no question, there is no basis to hold that a question was asked without a factual basis or that it was inflammatory or highly prejudicial. We therefore affirm.

**(3) *Miller stalked Lauren prior to her death.***

During his testimony, the medical examiner read the following from the "narrative summary" section of his autopsy report: "Reportedly the decedent was a 22-year-old white female that was allegedly shot by another on 2/28/16. Per medical staff the decedent was reportedly stalked by a male and he allegedly kicked in the door to her residence on 2/28/16." The defense objected to the testimony as a hearsay statement that contained the inflammatory word "stalking," and moved for a mistrial. The trial court found that the allegation of stalking did not add anything to the medical examiner's diagnosis or treatment and sustained the defense's objection. It denied the defense's motion for mistrial, but *sua sponte* admonished the jury as follows: "Ladies and gentlemen I'd admonish you to ignore the last statement made. You'll give it no weight as evidence when you deliberate on the evidence

31

presented." In addition, that portion of the autopsy report was redacted prior to being submitted as evidence.

Again, juries are presumed to follow an admonition to disregard evidence.[46] And the only way to overcome that presumption is to either show: (1) that "there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant" or (2) that "the question was asked without a factual basis and was inflammatory or highly prejudicial."[47]

In his brief to this Court, Miller presented no arguments as to why the trial court's admonition would have been ineffective, and there is nothing in the record that would lead us to hold otherwise. The jury was properly admonished, the autopsy report was redacted, and the allegation of stalking was never mentioned again. Consequently, we hold no error occurred.

### III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

---

[46] *Johnson*, 105 S.W.3d at 441.

[47] *Id.*

32

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark Daniel Barry
Assistant Attorney General